**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ROBERTO ALMODOVAR, JR.** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 18-cv-02341 |
| v. | ) | |
| | ) | |
| **REYNALDO GUEVARA,** | ) | |
| **ERNEST HALVORSEN, MARK** | ) | |
| **OLSZEWSKI, and the CITY OF** | ) | |
| **CHICAGO** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |
| | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff, ROBERTO ALMODOVAR, JR. by his undersigned attorney, for his complaint against former Police Detectives, REYNALDO GUEVARA, ERNEST HALVORSEN, MARK OLSZEWSKI and the CITY OF CHICAGO.

## INTRODUCTION

1.     Plaintiff, Roberto Almodovar, Jr., spent 23 years incarcerated in the Illinois Department of Corrections for the murders of Amy Merkes, Jorge Rodriguez, and the attempt murders of Kennelly Saez and Jacqueline Grande – crimes he did not commit.

2.     In and around September 4, 1994, the Police Officer Defendants – Reynaldo GUEVARA, Ernest HALVORSEN, and Mark OLSZEWSKI – conspired among themselves and with others, known and unknown, to prosecute Plaintiff for the murders of Merkes and Rodriguez and attempt murders of Grande and Saez while indifferent to the fact that he was innocent.

3.      All of the defendant officers concealed the fact that they had conspired to and did frame Plaintiff for the murders by knowingly inducing false identification testimony from the young and traumatized victims of the crime through trickery, manipulation, suggestion, pressure, coercion, and other unlawful tactics.

4.      No physical evidence connected Plaintiff to the crime and the defendant officers knowingly ignored Plaintiff's alibi that was verifiable through no fewer than seven witnesses. Without the Defendants' concealment of evidence, falsification of evidence, and manipulation of witness testimony, Plaintiff would never have been convicted.

5.      For two decades, Plaintiff fought to prove his innocence while the defendant officers continued to frame Latino men in the Humboldt Park area of Chicago until retiring with their full police pension.

6.      Finally, on April 14, 2017 (after an evidentiary hearing that lasted over two years) the office of the Cook County State's Attorney vacated Plaintiff's convictions and moved for an order to *nolle prosequi* the charges. That day, Plaintiff was released from custody. With no objection from the State, the Honorable Chief Judge of the Criminal Division, Leroy Martin, Jr., granted Plaintiff a Certificate of Innocence on November 20, 2017.

7.      Even before Plaintiff's formal exoneration, the City of Chicago retained former United States Attorney Scott Lassar and his firm Sidley & Austin to conduct an independent investigation into GUEVARA's conduct in a number of GUEVARA-related murder investigations, including Plaintiff's. The City, through their attorneys, concluded that Plaintiff was probably innocent of the murders of Merkes and Rodriguez and attempt murders of Grande and Saez.

8.     Sadly, Plaintiff is among a growing group of Latino men from Humboldt Park who have proven that they were framed for crimes they did not commit at the hands of the defendant officers. Just by way of example, defendants GUEVARA and HALVORSEN framed Armando Serrano and Jose Montanez for the 1993 murder of Rodrigo Vargas. Serrano and Montanez were exonerated on July 20, 2016, following the Illinois Appellate Court's issuance of a pair of scathing decisions acknowledging GUEVARA's pattern and practice of misconduct. *People v. Serrano*, 2016 IL App (1st) 133493 (June 7, 2016) *& People v. Montanez,* 2016 IL App (1st) 133726 (June 7, 2016). Serrano and Montanez received Certificates of Innocence in November 2016 and both filed federal civil rights actions that are currently pending in this Court. *See Serrano v. GUEVARA*, *et al.*, 17-cv-2869 and *Montanez v. GUEVARA ,et al.* 17-cv-4560.

9.     Defendant GUEVARA also framed Jacques Rivera who was wrongfully convicted of the 1988 murder of Felix Valentin. The Cook County State's Attorney's office vacated Rivera's conviction on October 4, 2011, and he received a Certificate of Innocence on September 5, 2012. A jury returned a verdict against GUEVARA and Mingey in the amount of $17,000,000.

10.     Since Plaintiff's exoneration less than a year ago, the State has vacated murder convictions of at least five other individuals who have demonstrated that they were framed by GUEVARA, HALVORSEN and Mingey including Jose Maysonet, Arturo Reyes, Gabriel Solache, Thomas Sierra, and Ariel Gomez.

11.     Plaintiff now seeks compensation for the incalculable hardship and injury he suffered as a result of the Defendants' egregious misconduct.

## JURISDICTION AND VENUE

12.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of Plaintiff's rights as secured by the United States Constitution as well as the deprivation of rights under Illinois state law.

13.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367. Venue is proper under 28 U.S.C. §1391(b), because the parties reside in this judicial district, and the events giving rise to the claims asserted herein occurred in this judicial district.

## PARTIES

14.     Plaintiff Robert Almodovar, a 44-year-old Latino man, is a citizen of the United States and resides in the City of Chicago.

15.     Defendant CITY OF CHICAGO is an Illinois Municipal Corporation, which employs or employed the Police Officer Defendants at the time of the events giving rise to this suit.

16.     At all relevant times hereto, Defendants Reynaldo GUEVARA (Star No. 16345) and Ernest HALVORSEN (Star No. 20692) were members of the Chicago Police Department and assigned to Area Five's Violent Crimes Unit. Defendant OLSZEWSKI (Star No. 4337) was a member of the 25th District gang team. Each of these defendants conspired with one another and with other persons, known and unknown, to conceal and fabricate evidence, manipulate witness testimony, and maliciously prosecute Plaintiff for the murders of Jorge Rodriguez and Amy Merkes.

17.     Each of the individual Chicago Police officer defendants are sued in his individual capacity, and each acted under color of state law and in the scope of his or her employment while engaging the actions alleged in this Complaint.

## FACTUAL ALLEGATIONS

18.     In 1993, Plaintiff lived with his aunt and uncle in the predominantly Hispanic neighborhood known as Humboldt Park. Plaintiff and several of his family members affiliated with the Insane Dragons street gang, but Plaintiff largely steered clear of gang-related activities.

19.     On April 27, 1994, Plaintiff turned 18 years old. In and around that time, defendant OLSZEWSKI began harassing Plaintiff mercilessly. Defendant OLSZEWSKI, a 25th District gang crimes officer despised Hispanics and began targeting Plaintiff for baseless arrests and racially-motivated verbal abuse in part because members of the Almodovar family lived in a neighborhood (near Normandy and Belden) adjacent to Humboldt Park that was comprised largely of white people. Plaintiff would often visit his cousin and girlfriend who both lived in the area of Normandy and Belden. Whenever OLSZEWSKI saw Plaintiff and his cousin in the neighborhood he would stop and harass them.

20.     For example, in and around spring 1993, Plaintiff was walking toward his cousin's house located near Belden and Rutherford Avenues. As Plaintiff walked down the street, OLSZEWSKI pulled up next to Plaintiff in his marked police car. OLSZEWSKI stated in sum and substance, "[t]ake your spic-ass back to Humboldt Park, you don't belong over here. You aren't fucking up this neighborhood."

21.     On another occasion in August 1993, Plaintiff was hanging out at a McDonalds on North avenue with some friends and his girlfriend, Azalia Carrillo ("Sassy"). Defendant OLSZEWSKI entered the establishment and ordered Plaintiff to come into the bathroom with him. Plaintiff complied. Once in the bathroom, OLSZEWSKI began questioning Plaintiff about an incident involving vandalism to a car. Plaintiff had no knowledge about the incident and told

OLSZEWSKI as much. OLSZEWSKI smacked Plaintiff around, called him a liar, and then arrested him. The charges were later dismissed.

22.     That same summer OLSZEWSKI cornered Plaintiff in an alley in Humboldt Park and said to him, in sum and substance, "I've been locking up your buddies. You think you're slick. But you aren't that slick. And when I do get you, you are going away for a long time."

23.     In and around March 1994, Plaintiff dissociated himself entirely from all gang activity upon learning that his girlfriend Sassy was pregnant with their daughter. Plaintiff began attending school and working full-time doing janitorial work at Farley's Chocolate Company.

24.     Between April 1993 and August 1994, Plaintiff was arrested for petty offenses like "mob action" and "gang loitering" roughly six (6) times. All cases were dismissed. Indeed, prior to the arrest that resulted in Plaintiff's 23-year wrongful conviction, he had no prior convictions.

**The Alibi**

25.     On August 31, 1994, Plaintiff worked an eleven-hour shift at Farley's Chocolate Company. He left work at roughly 5:00 p.m. and took a bus to Wilbur Wright College where he attended GED classes. Sometime between 9:30 and 10:00 p.m., he took a City bus back to his home at 1732 North Springfield Ave, arriving home at approximately 10:45 p.m.

26.     At the time, Plaintiff lived at the Springfield address with his aunt Mary Rodriguez, his uncle Jose ("Joe") Rodriguez, his 10-year old cousin, Joe Jr., his grandmother, his uncle Edwin, and his girlfriend Sassy who had given birth to their daughter Jasmine six-months earlier.

27.     When Plaintiff arrived home at roughly 10:45 p.m., he was angry because Sassy and the baby were not home. Sassy arrived home with the baby at roughly 11:00 p.m. and the two started arguing about Sassy having the baby out so late.

28.     Plaintiff's aunt Mary was upset with the young couple, because their arguing was disrupting other members of the household, including Joe Jr., whose first day of school was the following day, September 1, 1994. Indeed, the next-door neighbor was awakened by the yelling and screaming between Plaintiff and Sassy.

29.     Mary called her other nephew Sergio Almodovar and his wife Amaris Carrillo, Sassy's sister, and asked them to come to the house to help mediate the argument between Plaintiff and Sassy. Sergio and Amaris agreed.

30.     Sergio and Amaris spent an hour or two at the house helping ease the tensions between Plaintiff and Sassy and left the house at around 1:30 a.m. Plaintiff did not leave the Springfield residence between the time he arrived home around 10:45 p.m. and the next morning.

**The Shooting**

31.     While Plaintiff and Sassy were arguing and Sergio and Amaris attempting to mediate, a separate group of young people gathered on a stoop in front of an apartment building located at 3920 W. Cortland St.

32.     Among the group was Jacqueline Grande ("Grande"), Amy Merkes ("Merkes"), Jorge Rodriguez ("Rodriguez"), and Kennelly Saez ("Saez"). Rodriguez and Saez were longtime friends, Saez and Merkes were dating, and Grande described Merkes as her "best friend."

33.     Saez lived on the building's third floor; the building bordered the sidewalk for nearly a half-block, and a single lightbulb over the door illuminated the area. The nearest streetlight was a quarter block away on the opposite side of the tree-lined street.

34.     Saez and Rodriguez were members of the Manic Latin Disciplines street gang. In September 1994, the Disciples were purportedly in conflict with the Latin Kings, the Unknowns, and the Insane Dragons, but Saez lived on a neutral corner.

35.     At approximately 12:45 a.m., Saez was standing and speaking to his friends who remained sitting on a step adjacent to the sidewalk. A parkway separated the sidewalk from the street where cars were parked. A blue Oldsmobile drove down the street.

36.     The blue Oldsmobile containing three individuals passed them again, but this time it pulled into the alley that abutted the building. The car drove in reverse out of the alley, on to the street, and stopped in a space between two cars parked in front of the group. Saez approached the car and got as far as the sidewalk when the rear passenger said, "What's up, folks?" Saez replied, "who's that," and the rear passenger drew a handgun and began firing.

37.     When the firing began, Saez dove behind a parked car, and Grande, Merkes, and Rodriguez fled into the building's foyer, through an interior door, and up a staircase. Grande, Merkes and Rodriguez were shot as they ascended the staircase. Grande was shot in the back but kept fleeing up the stairs. Merkes collapsed and died in the stairwell. Rodriguez ran to Saez's third floor apartment and collapsed there. Grande took refuge in another third-floor apartment.

38.     The blue car sped away, and Saez ran to his third-floor apartment and called 911. Rodriguez was transported to a hospital and died soon thereafter. Grande was hospitalized for a gunshot wound to her back and shoulder.

39.     Chicago police officer Robert Lohman was on routine patrol when an off-duty deputy sheriff who lived in the area informed him that a drive-by shooting had occurred at the intersection of Cortland street and Harding avenue. Officer Lohman spoke to an injured Grande

on-scene who described the perpetrators as three Hispanics, sixteen to twenty years old, wearing Starter jackets. She was unable to provide any description of weights, heights, or hair styles.

40.     Later in the day on September 1, 1994, Grande spoke to detective Dembowksi at the hospital who memorialized her statements in a police report. Grande told Dembowksi that the assailants were "three male Hispanics; the driver was tall and thin, dark hair, light complexion. The front passenger had a thin long face with a light complexion, black jacket, red hat. The back-seat passenger was skinny, dark hair, medium complexion, clean looking, all teens and early twenties."

41.     Saez was interviewed at the police station after the shooting and could only describe the offenders as three male Latinos in a blue car. Saez told the police he dove behind a car when the shooting started and did not see the offenders.

42.     After a few days went by with no solid leads or arrests, defendants GUEVARA and HALVORSEN were assigned to the case.

**The Frame-Up**

43.     As they had done numerous times in the past, defendants GUEVARA and HALVORSEN began strategizing who they wanted to frame for the murders of Merkes and Rodriguez. The detectives and their sergeant agreed that there was no reason to waste time attempting to legitimately investigate the case and identify the true offenders since all the "gang bangers" in Humboldt Park were fungible and would eventually get what was owed to them, either death or murder charges.

44.     GUEVARA and HALVORSEN believed that there was a "gang war" taking place between the Maniac Latin Disciplines (the victims' gang) and the Insane Dragons and theorized

that the shooting on Cortland was in retaliation for the murder of an Insane Dragon that recently took place seven blocks away. Thus, it made sense to pin these murders on Insane Dragons.

45.     GUEVARA and HALVORSEN reached out to their colleagues in the 25th District for help in finding an Insane Dragon to frame. Defendant OLSZEWSKI had the perfect candidate – Plaintiff. Defendants GUEVARA and HALVORSEN asked OLSZEWSKI to obtain photos of Plaintiff so that he could use it to secure a false identification of Plaintiff as one of the offenders. But OLSZEWSKI had no photo of Plaintiff.

46.     With this in mind, the defendants derived a plan to arrest Plaintiff and obtain a photo of him that would later be used to frame him for the double murder. Defendant OLSZEWSKI went to Plaintiff's cousins house located on Rutherford avenue on the evening of September 4, 1994.

47.     That evening, Plaintiff was helping his uncle and cousins move out of their home on Rutherford avenue. While taking a break in the living room, they noticed a flashlight out in the yard. Sergio went outside to see what was going on and reported that defendant OLSZEWSKI was outside with his partner. OLSZEWSKI claimed that a "gang" meeting was taking place inside which authorized the officers to search the house.

48.     OLSZEWSKI ordered Plaintiff (and his family members) on the floor while he and his partner searched the home. OLSZEWSKI returned with a mysterious duffel bag that allegedly contained a sawed-off shotgun. OLSZEWSKI took Sergio into a bedroom and began questioning him about whether he had any knowledge about the shooting on Cortland. Sergio denied having knowledge and OLSZEWSKI began striking him, demanding information. Having no knowledge about the shooting, Sergio continued to come up empty-handed while OLSZEWSKI continued to beat him.

49.     Eventually Plaintiff and his cousins were arrested. Plaintiff was charged with simple "mob action" but the true purpose of Plaintiff's arrest was to obtain a Polaroid photo of him so he could be framed by the defendant officers for the murders on Cortland avenue. Despite having been arrested for mob action and brought to the 25th District on a number of prior occasions, Plaintiff had never had his Polaroid taken. This time was different. OLSZEWSKI took a Polaroid photo of Plaintiff himself.

50.     OLSZEWSKI promptly provided the Polaroid photo of Plaintiff to defendants GUEVARA and HALVORSEN with the understanding, knowledge, and intent that the photo would be used to frame Plaintiff for the murders of Merkes and Rodriguez. Defendants GUEVARA and HALVORSEN asked OLSZEWSKI to provide them with a photo of another known Insane Dragon, named Willie Negron who was one of Plaintiff's friends. Negron also happened to be the son of GUEVARA'S wife's best friend.

51.     Defendants OLSZEWSKI, GUEVARA, and HALVORSEN discussed that one of the victims Jackie Grande was young and vulnerable and could be easily manipulated into identifying Plaintiff and Negron as the offenders. They also discussed that Saez was a rival gang member who could easily be leaned on to make a false identification of Plaintiff and Negron.

52.      Defendants GUEVARA and HALVORSEN brought the photos to Grande while she was still at the hospital convalescing and falsely told her that Plaintiff and Negron were the offenders who shot her and murdered her friends. GUEVARA and HALVORSEN told Grande that when she was released from the hospital, she would have to identify them in a live line-up.

53.     On September 11, 1994, defendants GUEVARA and HALVORSEN arrested Plaintiff and brought him into Area Five to be interviewed. According to defendant HALVORSEN, Plaintiff admitted to being a current member of the Insane Dragons street gang

and acknowledged that the Insane Dragons and the Maniac Latin Disciples were at war with one another. Those statements were false. HALVORSEN also falsely reported that Plaintiff told him that he had been told by Willie Negron at a gang meeting that the "war" had been called off.

54.     Defendants GUEVARA and HALVORSEN then arrested Negron and brought him to Area Five. Mingey was the supervising sergeant for the arrests of both Plaintiff and Negron.

55.     On September 12, 1994, defendant GUEVARA went to Grande's house to pick her up to view a live line-up. With the knowledge and approval of HALVORSEN, GUEVARA again showed Grande the same photos of Plaintiff and Negron they had previously showed her at the hospital. GUEVARA falsely told Grande that Plaintiff was the shooter in the rear seat of the car and that Negron was driving the car and was also a shooter. GUEVARA also told Grande that they would have to get Saez to make the same identifications.

56.     GUEVARA and Grande drove to Saez's house. GUEVARA showed Saez the photos of Plaintiff and Negron and falsely told him that they were the offenders. Saez was reluctant to agree because he had not actually seen the offenders but Grande assured him that GUEVARA was positive that they were they offenders. Saez felt extremely guilty that his gang involvement had caused the death of his girlfriend and best friend and felt enormous pressure to go along with the program. GUEVARA reassured him that Plaintiff and Negron were the offenders and that he should identify them. Saez knew that he possessed no independent knowledge that Plaintiff and Negron were the offenders but ultimately did what GUEVARA told him to do.

57.     GUEVARA took Saez and Grande to Area Five to view a line-up. GUEVARA told Saez not to mention that he had been shown photographs of Plaintiff and Negron prior to viewing the line-up.

58.     Defendants GUEVARA and HALVORSEN conducted a live line-up at roughly 6:00 p.m. on September 12, 1994. The defendant officers knew that no probable cause existed to justify the arrests of Plaintiff and Negron but nonetheless had Grande and Saez view a line-up knowing that their unlawful tactics would produce a false identification of Plaintiff and Negron. Unsurprisingly, Grande and Saez identified Plaintiff and Negron as the offenders based on the false statements of GUEVARA and HALVORSEN and the photos of Plaintiff and Negron previously shown to them.

59.     After being falsely identified and then confined to a holding cell, defendant OLSZEWSKI popped his head in, looked directly at Plaintiff in the eyes, and said, "Gotcha!" before walking away laughing.

### Plaintiff's Wrongful Conviction

60.     At Plaintiff's trial GUEVARA falsely testified that after the shooting, Saez told him that the rear passenger-seat occupant of the car [the shooter] had a rectangular head and long hair. GUEVARA falsely testified that based on Saez's description and his belief that the murder was in retaliation for the prior murder of an Insane Dragon, GUEVARA obtained a photograph of Plaintiff and his "associate" Willie Negron.

61.     GUEVARA falsely testified that during a telephone interview with Grande on September 5, 1994, Grande described the car's rear passenger exactly as Saez had a few days earlier, that is, he had a rectangular head and long hair. GUEVARA's testimony concerning prior descriptions of the offenders by Grande and Saez were entirely fabricated.

62.     GUEVARA falsely testified that he showed Grande two different photo arrays, one depicting individuals with long hair like Plaintiff and another depicting individuals with short hair like Negron and that she identified Plaintiff and Negron respectively from the two photo arrays. This testimony was wholly fabricated. GUEVARA *never* showed Grande photo arrays and GRANDE never identified Plaintiff or Negron from those alleged photo arrays.

63.     Although Saez provided a sworn statement recanting his identification of Plaintiff and Negron prior to Plaintiff's trial, Saez ultimately identified Plaintiff and Negron at trial. Saez later testified that he implicated Plaintiff and Negron at trial in hopes of obtaining favorable treatment from the state regarding his pending violation of probation charge. Assistant Cook County State's Attorney Callahan contacted Saez before Plaintiff's trial and Saez explained that after that conversation it was his understanding that if he testified for the State, he would be released from custody. Saez's probation was in fact terminated on November 30, 1995, two days after his November 28, 1995 trial testimony against Plaintiff.

64.     As a result, GUEVARA's false statements to Grande that Plaintiff and Negron were the shooters in conjunction with the improper and highly suggestive tactic of showing Grande a single photo of Plaintiff prior to having her identity Plaintiff from a line-up, Grande again identified Plaintiff as the shooter at Plaintiff's trial consistent with her prior identification.

65.     Based on the foregoing false and fabricated testimony, a jury convicted Plaintiff of two counts of first degree murder and two counts of attempt first degree murder. The trial court judge found Plaintiff eligible for the death penalty but sentenced him to a term of natural life imprisonment consecutive to two 30-year terms for attempt for first degree murder.

66.     Plaintiff's convictions and sentence were affirmed on direct appeal. Private attorney Matthew Kennelly (now United States District Court Judge Matthew Kennelly)

14

represented Plaintiff during post-conviction proceedings, alleging Plaintiff's actual innocence. At an evidentiary hearing, Saez testified that GUEVARA showed him photographs of Plaintiff and Negron prior to viewing a live line-up and falsely told him that "these are the guys who did the shooting." Saez explained that he studied the photos and "went along with it," even though he could not identify them as the offenders.

67.     Saez testified that GUEVARA instructed him not to mention that he viewed the photos prior to making the live line-up identification.

68.     GUEVARA also testified at the evidentiary hearing falsely claiming that he *never* showed Saez any photographs prior to viewing the line-up. GUEVARA testified that he developed a "feeling" during the investigation's preliminary stages that Plaintiff, who had been arrested for mob action a few days before the shooting, was involved.

69.     Cook County Circuit Judge James Linn denied Plaintiff's post-conviction petition, instead crediting GUEVARA's false testimony.

**Plaintiff's Exoneration**

70.     Throughout his wrongful incarceration, Plaintiff tirelessly fought to prove that he was innocent and wrongfully convicted of the 1994 murders. In 2010, Plaintiff filed a *pro se* successive post-conviction, alleging that new evidence showed that detective GUEVARA had a widespread pattern and practice of framing people. The petition was summarily dismissed by the circuit court, but the appellate court reversed the cause for further post-conviction proceedings in a published decision, *People v. Almodovar*, 2013 IL (1st) 101476 (1st Dist. 2013).

71.     Plaintiff, through his counsel, filed an amended post-conviction petition, alleging Plaintiff's actual innocence. An evidentiary hearing was held on the petition during which Plaintiff presented substantial evidence of GUEVARA's pattern and practice of misconduct.

GUEVARA refused to testify, instead asserting his Fifth Amendment right to remain silent in response to each and every question directed at him. Saez again testified that he had never seen the shooters and only identified Plaintiff and Negron because GUEVARA showed him a photo of the Plaintiff and told him he was the offender and to identify him from the live line-up.

72.     Prior to a ruling from the circuit court judge, the office of the Cook County State's Attorney consented to granting Plaintiff and Negron's post-conviction petitions on the grounds that newly discovered evidence was of such a conclusive character that it would probably change the result on retrial. The Cook County State's Attorney then moved to vacate Plaintiff and Negron's convictions and *nolle prosequi* all charges.

73.     After spending 23 years in the Illinois Department of Corrections, Plaintiff was released from custody on April 14, 2017.

74.     With no objection from the State, the Honorable Leroy Martin, Jr. granted Plaintiff (and William Negron) a Certificate of Innocence on November 20, 2017.

### Defendants GUEVARA and HALVORSEN'S
### History of Framing Innocent Persons

75.     Tragically, Plaintiff's wrongful conviction at the hands of defendant GUEVARA and his accomplices, including defendant HALVORSEN, is not an isolated miscarriage of justice. Over the course of two decades, the trio framed literally dozens of other innocent men who have all lodged independent accusations of similar misconduct against him.[1]

76.     GUEVARA, HALVORSEN, and Mingey are the subject of an ever-growing number of litigations both in criminal and civil courts. GUEVARA has consistently refused to testify about any of his activities as Chicago police officer on grounds that truthful testimony

---

[1] https://www.buzzfeed.com/melissasegura/detective-GUEVARAs-witnesses?utm_term=.tymQzXk3Yn#.lhx2y8nblB

would subject him to criminal liability. HALVORSEN has also invoked his Fifth Amendment right against self-incrimination in response to questioning about his investigations.

77.     Defendant GUEVARA has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including abusive tactics, manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. There are dozens of identified cases in which GUEVARA has engaged in serious investigative misconduct, including many cases in which he has manipulated and coerced witnesses and fabricated and concealed evidence, as he did in this case. In many of these cases, detective HALVORSEN worked hand-in-hand with GUEVARA while Mingey supervised the rogue detectives, approved their investigations, and sometimes played an even more active role in framing suspects.

78.     Given this extensive history, it is apparent that GUEVARA and HALVORSEN engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline then for doing so.

79.     Regarding his role in framing Plaintiff, Defendant GUEVARA has asserted his Fifth Amendment right to silence when questioned about: whether he framed Plaintiff; whether he induced Grande and Saez to falsely identify Plaintiff by showing them photographs of Plaintiff and Negron and telling them to identify them from a live line-up. GUEVARA asserted his Fifth Amendment right in response to questions regarding his frame-ups of dozens of others.

80.     Repeatedly, defendant GUEVARA has also invoked his Fifth Amendment right And refused to answer any questions about allegations that he manipulated dozens of witnesses to provide false identifications because truthful responses could subject him to criminal liability, including every single instance of misconduct detailed below. And recently, defendant

HALVORSEN has begun asserting their Fifth Amendment rights to refuse to answer questions about their involvement in Area Five investigations, most recently in response to interrogatories propounded to them in the federal civil rights litigation brought by Armando Serrano and Jose Montanez.

81.     Bill Dorsch is a former Chicago police detective. While serving with the Chicago police department, Dorsch was assigned to investigate a murder.  Several months after the murder occurred, Defendant GUEVARA brought two juveniles to the police station who purported to have witnessed a shooting and recorded the license place of the shooter.

82.     Based on the information provided, Detective Dorsch created a photo array for the juveniles to attempt to identify the shooter.  While the first juvenile was viewing the photo array, and before he identified any of the photographs, Defendant GUEVARA pointed to the suspect's photo and told the juvenile "that's him."  The juvenile then agreed with GUEVARA, saying that was the person who committed the shooting.

83.     Dorsch then directed Defendant GUEVARA to leave the room and had the other juvenile view the same photo array, and he was unable to make any identification.

84.     Based on the first juvenile's identification, the suspect was charged with murder. Subsequently, Dorsch spoke to the two juveniles without Defendant GUEVARA being present. The juveniles admitted that they had been paid to falsely claim that the suspect was the person responsible for the shooting.  After prosecutors spoke to the two juveniles, the suspect was released.

85.     Defendant GUEVARA's activities have drawn the interest of federal law enforcement officers. In 2001, the FBI authored a special report detailing the criminal activity of Chicago Police Officer Joseph Miedzianowski and his associates, including Defendant

GUEVARA. The report details that Defendant GUEVARA, while acting in his capacity as a police officer, would apprehend drug and gun dealers and then allow them to "buy their way of trouble." According to the report, GUEVARA also took bribes to alter both positive and negative lineups of murder suspects. Finally, the report states that GUEVARA, using an attorney [Richard Beuke] as a conduit, would receive cash in exchange for the ultimate dismissal of murder cases he investigated.

86.     In 1989, Defendant GUEVARA coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Defendant GUEVARA put Perez inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Juan Johnson to take the blame for the murder. Unsurprisingly, Perez subsequently falsely identified Johnson as a murderer.

87.     In 1989, Defendant GUEVARA also coerced Salvador Ortiz into making a false identification of Juan Johnson, which he later recanted.

88.     Juan Johnson was later exonerated and brought suit against Defendant GUEVARA. A federal jury found that GUEVARA framed Johnson for murder and awarded Johnson $21 million in damages.

89.     In 1989, Defendant GUEVARA coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz that if he did not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

90.     In 1989, Defendant GUEVARA coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false identification by telling him who to identify and making a veiled threat as to what would happen if he did not.

91. In 1990, Defendant GUEVARA physically coerced Jose Maysonet into falsely confessing to the murders of Torrence and Kevin Wiley. Mingey also falsely reported that Maysonet had admitted his involvement in the double murder. Maysonet's convictions were reversed in 2016 and all charges against him were dismissed in November 2017.

92. In 1991, Defendant GUEVARA coerced Wilfredo Rosario into making a false identification and giving false testimony before the Grand Jury by threatening Rosario that if he did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder. GUEVARA fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the participants in the crime. Rosario recanted his identification of Arcos at trial. Though Arcos was still found guilty of murder by a jury, the appellate court overturned the conviction based on the lack of sufficient evidence.

93. In 1991, Defendant GUEVARA physically coerced sixteen-year-old David Velazquez into making a false identification and giving false testimony by taking him to a rival gang's territory, beating him while chained to a wall at Area 5, and threatening to "get you for anything I can" if he did not talk. All of the false details of Velazquez's statement were provided by GUEVARA.

94. In 1993, Defendant GUEVARA coerced an identification from Carl Richmond by threatening Richmond that he could make his life very uncomfortable if Richmond did not identify Robert Bouto as the murderer of one of Richmond's friends. Richmond, who was familiar with GUEVARA's tactics, believed that GUEVARA would honor this threat.

95. In 1995, Defendant GUEVARA arrested Edwin Davila and, in an attempt to coerce a confession, chained him to the wall of an interrogation room and told him that he was going to frame him for murder. After Davila told GUEVARA that he did not do it, GUEVARA forced

Davila to participate in a lineup in which two witnesses identified Davila as the perpetrator, despite the fact that each of those witnesses had previously told the police that they had not been able to see the shooter.

96.     In 1991, Defendant GUEVARA told Efrain and Julio Sanchez to pick David Colon out of a lineup.  As a result, these men falsely claimed that Colon had committed murder, but later came forward to bring Defendant GUEVARA's misconduct to light.

97.     In 1995, Defendant GUEVARA coerced Evelyn Diaz into making a false identification and providing false testimony to the Grand Jury by threatening Diaz that if she did not identify Luis Serrano as the shooter, her children would be taken away by the Department of Children and Family Services.

98.     In 1995, Defendant GUEVARA told Luis Figueroa to falsely identify Angel Diaz as the perpetrator even though Figueroa did not see anything. Figueroa identified Diaz but recanted his identification at trial.

99.     In 1995, Defendant GUEVARA coerced Gloria Ortiz Bordoy into making a false statement and testifying falsely against Santos Flores at trial. During Ortiz Bordoy's six-to-eight-hour interrogation, GUEVARA yelled in her face, threatened that her children would be taken by the Department of Children and Family Services, called her "the B word," and "raised his hand" saying that he "felt like smacking" her.  Finally, without reading its contents, Ortiz Bordoy signed a statement that the detectives wrote out for her because she just wanted to "get out of there."

100.     In 1995, Defendant GUEVARA coerced Rodolfo Zaragoza, who was a victim and an eyewitness to a crime, into making a false identification and providing false testimony. Zaragosa was intimidated by GUEVARA and identified Ricardo Rodriguez as the offender because GUEVARA told him that Rodriguez was the shooter.

101.    In 1995, Defendant GUEVARA engaged in misconduct when he told Jose Melendez to falsely identify Thomas Sierra as the shooter even though Melendez did not see the shooter. Melendez identified Sierra, but recanted his identification at trial. Thomas Sierra was exonerated last year but only after serving his enter sentence.

102.    In 1996, Defendant GUEVARA coerced Maria Rivera into making a false identification of a man in a lineup by unzipping his pants and propositioning her. Rivera later told the prosecutor that she had falsely identified an individual in a lineup at GUEVARA's direction. The prosecution later abandoned murder charges against the individual whom Rivera falsely identified in the lineup.

103.    In 1997, Defendant GUEVARA coerced Robert Ruiz into making a false identification.  GUEVARA detained Ruiz repeatedly over the course of a ten-day period, locking him in an interrogation room without food, water, or a bathroom. Though Ruiz kept telling GUEVARA that he had not seen the shooter or the driver involved in the crime, GUEVARA told Ruiz whom to identify and what to say in his statement. Ruiz finally implicated Freddy and Concepcion Santiago in the murder because Ruiz believed that GUEVARA would continue to harass him until he changed his story. Ruiz recanted his identification at trial, and the judge found Freddy and Concepcion Santiago not guilty. The trial judge found it disturbing that GUEVARA was the lead detective in the case because the victim was GUEVARA's nephew.

104.    In 1997, Defendant GUEVARA withheld physical evidence and failed to disclose the exculpatory statements of witness Ruth Antonetty to Ariel Gomez. Gomez was accused of firing multiple shots from a car into a crowd. Ruth Antonetty told GUEVARA that she heard multiple shots coming from within the crowd, not from Gomez's vehicle. GUEVARA continued to pressure her to change her account, and when she would not, he told her he "had other

22

witnesses" and "didn't need her." As a result, Ariel Gomez did not have access to key *Brady* material at his trial. Gomez was also exonerated last year.

105.    In 1998, Defendant GUEVARA used suggestive tactics to force twelve-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin.  As a result, Rivera was convicted of murder.  In 2011, Lopez testified at an evidentiary hearing that he had never been able to identify Rivera as the murderer.  As a result, Rivera received a new trial. Ultimately, the State's Attorney dropped all charges against Rivera. Rivera was awarded a Certificate of Innocence and his federal civil rights action is currently pending in this Court.

106.    In November 2001, Defendant GUEVARA's girlfriend, Judith Martinez, attended a trial in which GUEVARA was testifying and observed the testimony of trial witnesses.  She then conferred with GUEVARA, even though the Court had ordered all witnesses excluded from the courtroom to prevent collusion among the witnesses.

107.    In 1982, Defendant GUEVARA and another officer arrested and physically assaulted Annie Turner for smoking on a bus.  GUEVARA called her a "bitch" and pushed her out the back door of the bus.  He twisted her arm, threatened to "snap" it, and handcuffed her so tightly that her skin broke.  He also hit her across the face with a metal bracelet he was wearing and called her a "nigger bitch."  Turner sought medical treatment and filed a complaint with the Office of Professional Standards.

108.    In 1982, Defendant GUEVARA and three other officers broke through Almarie Lloyd's locked front door and conducted a warrantless search of her  home. When Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd, her brother, and two children, and left the home in shambles. Lloyd filed a complaint with the Office of Professional Standards the next day.

109.     In 1983, Defendant GUEVARA and other officers forcibly removed Leshurn Hunt from his home and handcuffed him to a ring in the wall at the police station where he was beaten about the head, face, and body until he confessed to murder and robbery charges. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep until after he confessed. Hunt sought medical treatment for his injuries and filed a complaint with the Office of Professional Standards. Witnesses who saw Hunt while in custody corroborated his claim of a beating by the police. The criminal court judge suppressed Hunt's confession, and a jury returned a favorable verdict in a related civil rights action on Hunt's claim of excessive detention against the City of Chicago.

110.     In 1984, Defendant GUEVARA and other officers physically assaulted Graciela Flores and her 13-year old sister Anna during a search of their home, during which the officers did not identify themselves as police. GUEVARA repeatedly slapped Graciela, called her a "bitch" and pulled her hair. As a result of this incident, Graciela's arm was dislocated/broken and she spent one week in the hospital.

111.     In 1985, Defendant GUEVARA attempted to coerce a false statement from Reynaldo Munoz. GUEVARA handcuffed Munoz and put him in the back of a squad car. When Munoz denied knowing the people GUEVARA was asking about, GUEVARA repeatedly hit him in the mouth with his fist. GUEVARA then took Munoz to rival gang territory where he allowed rival gang members to spit on Munoz and beat Munoz about the head. Munoz was later framed by defendant HALVORSEN for the murder of after HALVORSEN induced a false identification from an alleged witness to the shooting.

112.     In 1986, Defendant GUEVARA threw Rafael Garcia against a car, struck him in the face several times, kicked him and hit him in the head. Garcia filed a complaint with the

24

Chicago Police Department's Office of Professional Standards (OPS). Although GUEVARA denied the charges, Garcia's complaints were corroborated by physical evidence, as he was treated at the hospital for lacerations to the head. After an investigation into the incident, OPS found that GUEVARA had lied about the incident and recommended that GUEVARA be suspended for two days.

113.    In 1986, Defendant GUEVARA and two other officers coerced a confession from Daniel Pena by beating him about the face and ribs with their hands and about the groin and thighs with flashlights during an interrogation. Pena was taken to see a doctor where he complained about being beaten by the police. The doctor found bruising to Pena's legs and abrasions and lacerations to Pena's nose. Family members corroborated Pena's claim that he had been beaten while in police custody.

114.    In 1986, Defendant GUEVARA pulled over Melvin Warren because Warren cut him off while driving westbound on Augusta Boulevard. GUEVARA called Warren a "nigger dog" and "threatened to tear [Warren's] head off." GUEVARA hit Warren in the face with a closed fist and then forced him down into the front seat of his car and began to choke him. Two eyewitnesses confirmed that GUEVARA initiated the beating. In response to this incident, Warren sought medical treatment and filed a complaint with the Office of Professional Standards (OPS). OPS sustained Warren's allegations that GUEVARA had physically and verbally assaulted him and recommended that GUEVARA be reprimanded.

115.    In 1989, Defendant GUEVARA coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to release him unless he confessed to the murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime he knew nothing about.

116. In 1991, Defendant GUEVARA coerced David Rivera into signing a confession for murder by intimidation, threats, and inducements. GUEVARA told Rivera that if he confessed he would serve seven years in prison whereas if he did not confess, he would be sent away for fifty years. GUEVARA then promised Rivera that if he signed a statement, he could go home.

117. In 1991, Defendant GUEVARA coerced a false confession from Daniel Rodriguez through the use of threats and intimidation. While en route to the police station, GUEVARA threatened to harm Rodriguez's family if he did not cooperate. Once at Area 5, Rodriguez was chained to a wall, denied food, water, and use of a restroom, and beaten by GUEVARA's partner, Defendant HALVORSEN in the chest and torso. GUEVARA provided details of the crime to Rodriguez to include in Rodriguez's false confession.

118. In 1992, Defendant GUEVARA engaged in misconduct when he interrogated Jacqueline Montanez without a youth officer present. The appellate court reversed and remanded Ms. Montanez's conviction for murder, noting that "not only was defendant interrogated before having an opportunity to confer with a concerned adult, but, worse, any opportunity to do so was effectively frustrated by police."

119. In 1993, Defendant GUEVARA arrested fifteen year old Eliezar Cruzado and threatened him with life imprisonment if he did not make a statement implicating himself in a murder. GUEVARA also told Cruzado that he could go home and see his family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write.

120. In 1993, Defendant GUEVARA used physical force and threats to coerce a false confession from Adolfo Frias-Munoz. Over the course of a two-day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face with an open hand

by Defendant GUEVARA, and beaten by two other officers. Though isolated in a locked interrogation room, Frias-Munoz could hear his wife screaming and his son crying in another room. GUEVARA threatened Frias-Munoz that if he did not confess, his wife would go to prison and his children would be taken away. Frias-Munoz, who did not speak English, agreed to give a statement to an assistant state's attorney. Frias-Munoz spoke in Spanish and GUEVARA translated the statement so that the prosecutor could write the statement in English. Frias-Munoz then signed a statement he could not read.

121.    In 1994, Defendant GUEVARA, after 14 hours of interrogation, coerced a confession from Adrian Duta by hitting him in the face with an open palm, punching him in the stomach, and telling him he could go home if he signed a statement. When Duta's father came to see Duta at the station house, Duta was exhausted and crying and repeatedly said that he did not know what he had signed and had only signed the document so he could go home. Duta complained to his father of being struck in the head and stomach by GUEVARA.

122.    In 1995, Defendants GUEVARA and HALVORSEN coerced a confession from 17-year-old Santos Flores after handcuffing him to the wall of a locked interview room and refusing his requests for an attorney. During the course of the 11-hour interrogation, GUEVARA yelled at him, slapped him numerous times on the side of his head, and told him that if he did not confess he would never see the light of day. Flores eventually gave a statement to the police indicating his involvement in the crime. Flores's statement was ruled inadmissible on appeal on the grounds that it was elicited in violation of *Miranda*.

123.    In 1997, Defendant GUEVARA coerced a false confession from Voytek Dembski by beating him while chained to a wall in a locked interrogation room. Dembski, a Polish National who did not speak English, was interrogated by GUEVARA without *Miranda* warnings, without

notification to the Polish consulate, and without a Polish language interpreter. Dembski could not read the statement he eventually signed as it was written in English.

124.     In 1998, Defendant GUEVARA repeatedly hit Rosauro Mejia in an attempt to coerce a confession from him. Rosauro never confessed and was finally released after being held in custody for three days.

125.     In 1998, Defendant GUEVARA repeatedly pulled Adriana Mejia's hair and struck her once on the back of her neck while she was interrogated.

126.     In 1998, Defendant GUEVARA repeatedly threatened and beat Arturo Reyes in an attempt to unconstitutionally coerce Reyes into giving an incriminating statement. After two days of isolation and interrogation, Reyes provided a false statement.

127.     In 1998, Defendant GUEVARA repeatedly struck Gabriel Solache on the left side of his head and in the stomach while Solache was chained to the wall of a locked interrogation room. After 40 hours of interrogation, Solache gave a false statement so the beating would stop. Solache sought medical treatment and sustained permanent hearing loss to his left ear.

128.     Reyes and Solache were also exonerated last year and released from prison.

**Plaintiff's Damages**

129.     Plaintiff has suffered and continues to suffer enormous physical and psychological injury as a direct and proximate result of the Defendants' misconduct. Plaintiff faced the risk of being executed for a crime he did not commit after having been found eligible for the death penalty. Plaintiff spent 23 years of his life imprisoned for crimes that he did not commit. He woke up each day with this reality, not knowing whether he would see his family or child again outside prison property or ever successfully prove the wrongfulness of his conviction and incarceration.

130.     Over the course of his 23 years of imprisonment, Plaintiff was separated from his daughter who was only six months old when he was incarcerated. Plaintiff lost the chance to raise, care for, and mentor his child who was a grown woman by the time Plaintiff was released from prison.

131.     As a result of Defendants' actions, Plaintiff continues to experience physical and psychological pain and suffering, humiliation, constant fear and anxiety, deep depression, despair, rage, and other physical and psychological effects from his years of wrongful conviction.

## COUNT I
### 42 U.S.C. § 1983 – Due Process:  Fabrication of Evidence

132.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

133.     As more fully described above, all of the individual Police Officer Defendants, acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments by fabricating Grande and Saez's statements about the shooting and testifying falsely about the witnesses' statement, as well as fabricating other evidence.

134.     According to a plan devised by the defendant officers, Defendant OLSZEWSKI falsely arrested Plaintiff for the sole purposes of obtaining a Polaroid photo of him that would be used to unlawfully influence and manipulate Grande and Saez for the purpose of securing a false identification of Plaintiff.

135.     In the manner described more fully above, Defendants fabricated, coerced, manipulated and/or solicited false testimony from Saez and Grande implicating Plaintiff in the

crimes that they knew he did not commit; falsified police reports; obtained Plaintiff's conviction using false evidence; and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial. Defendant HALVORSEN was primarily responsible for authoring the police reports that contained false statements by the witnesses and omitted the suggestive and improper tactics utilizes to induce fale identifications from the witnesses.

136.    The defendant officers knowing and intentionally fed false statements to Grande and Saez prior to Plaintiff's arrest and subsequent charging.

137.    The Police Officer Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

138.    Absent this misconduct, Plaintiff would not have been wrongfully convicted of the murders of Merkes and Rodriguez and attempt murders of Grande and Saez. Thus, the Police Officer Defendants' misconduct deprived Plaintiff of his constitutional right to a fair trial and directly resulted in Plaintiff's wrongful conviction.

139.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

140.    As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

141.    The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT II
## 42 U.S.C. § 1983 – *Brady* Violations

142.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

143.    As described in detail above, all of the individual Police Officer Defendants, acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments by withholding and suppressing exculpatory evidence from Plaintiff and the prosecution.

144.    The Police Officer Defendants also continued to suppress exculpatory evidence after Plaintiff's conviction, including during an evidentiary hearing on Plaintiff's original post-conviction petition. Had this exculpatory evidence been disclosed, Plaintiff would not have spent 23 years in prison for a crime he did not commit.

145.    The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total disregard of the truth and Plaintiff's clear innocence.

146.    As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

147.    The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT III**
**42 U.S.C. § 1983 – Malicious Prosecution**

148.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

149.    In manner more fully described above, the Defendant officers, acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his Fourth and Fourteenth Amendment constitutional rights.

150.    The Defendant officers accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so, in violation of his rights secured by the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

151.    In so doing, the Defendant officers caused Plaintiff to be unreasonably seized and improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and in all such proceedings were ultimately terminated in Plaintiff's favor indicative of his innocence.

152.    The Defendant officers subjected Plaintiff to unauthorized and arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a  crime of which he was totally innocent, through the Defendant officers' fabrication, suppression, and withholding of evidence.

153.    The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total disregard of the truth and Plaintiff's clear innocence.

154.    As a direct and proximate result of this deprivation of his constitutional right, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

155.    The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT IV
## 42 U.S.C. § 1983 – Conspiracy

156.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

157.    All of the individual Police Officer Defendants and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to coerce, induce, and fabricate false evidence in the form of witness statements and testimony for the purpose of framing Plaintiff for a crime he did not commit.

158.    All of the individual Police Officer Defendants and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to deprive Plaintiff of material exculpatory evidence and information to which he was lawfully entitled and to conceal their misconduct from Plaintiff, all in violation of Plaintiff's constitutional rights, as described above.

159.     In this manner, the Police Officer Defendants, acting in concert with other known and unknown co-conspirators, conspired to accomplish an unlawful purpose by an unlawful means.

160.     In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant joint activity.

161.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

162.     As a direct and proximate result of this of this illicit agreement referenced above, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

163.     The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT V**
**42 U.S.C. § 1983 – Failure to Intervene**

164.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

165.     In the manner described above, one or more of the individual Police Officer Defendants, and other unknown individuals, stood by without intervening to prevent the alleged constitutional violations, despite having an opportunity to do so.

166.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with willful indifference to Plaintiff's constitutional rights, and in total disregard of the truth and Plaintiff's innocence.

167.     As a direct and proximate result of this failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including, but not limited to, loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

168.     The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT VI**
**42 U.S.C. § 1983 –** *Monell* **Policy Claim**

169.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

170.     The Chicago Police Department is responsible for scores of miscarriages of justice. Since 1986, no fewer than 75 documented cases have come to light in which Chicago Police Detectives amassed "evidence" against an innocent person for a serious crime that he did not commit. There are undoubtedly many more such cases that have not yet been discovered.

171.     The false charges against innocent people include numerous cases in which Chicago Police Officers used the very same tactics that Defendants GUEVARA, HALVORSEN, and OLSHEWSKI employed against Plaintiff in this case, including: (1) concealment of exculpatory evidence; (2) manipulation of witnesses in order to obtain false identifications; (3) manipulation of witnesses in order to influence their testimony; (4) procuring false witness testimony from detainees and "jailhouse snitches" and (5) the use of other tactics to secure the arrest, prosecution and conviction of a person without regard to his actual guilt or innocence of the offense.

172.    At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos and other information in files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed at the close of the investigation, rather than being maintained as part of the official file.

173.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, concealed exculpatory evidence from Plaintiff.

174.    At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, routinely manipulated, tricked, lied to, and misled witnesses for the purpose of influencing their testimony to conform to a false narrative contrived by the officers themselves. As a matter of widespread practice and custom, these tactics were also used to induce false identifications of suspects.

175.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, manipulated, tricked, and improperly influenced the testimony of the two living victims in this case, Jacqueline Grande and Kennelly Saez. In the case of Saez, the defendants failed to disclose that Saez had been tacitly promised a "get out of jail free" card in exchange for his testimony against Plaintiff.

176.     The City of Chicago and the Chicago Police Department has failed to investigate any of the cases in which Chicago Police Detectives recommended charging an innocent person with a serious crime, and no Chicago Police Officer has ever been disciplined as a result of his misconduct in any of those cases.

177.     Prior to and during 1994, the year in which Plaintiff was falsely charged with the Merkes and Rodriguez murders, the City of Chicago operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct. The Former Chicago Police Officer of Professional Standards almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in the same type of misconduct.

178.     As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

179.     As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of

these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens

180.   The defendant officers have a long history of engaging in the kind of investigative misconduct that occurred in this case, including the manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. There are approximately 40 known cases in which GUEVARA and HALVORSEN have engaged in serious investigative misconduct, including many cases in which they have manipulated and coerced witnesses and fabricated and concealed evidence, as he did in this case. GUEVARA engaged in such misconduct because he had no reason to fear that the City of Chicago and its Police Department would ever discipline him for doing so.

181.   The City of Chicago and its Police Department failed in 1994 and in the years prior to provide adequate training to Chicago Police Detectives and other officers in any of the following areas, among others:

a.   The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

b.   The need to refrain from manipulation or potentially coercive conduct in relation to witnesses.

c.   The risks associated with relying on testimony from "jailhouse snitches."

d.   The risks of wrongful conviction and the steps police officers should take to minimize risks.

e.   The risks of engaging in tunnel vision during investigation.

      f.     The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

182.    The need for police officers to be trained in these areas was and remains obvious. The City of Chicago's failure to train Chicago Police Officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

183.    The City's failure to train supervise and discipline its officers, including repeat offenders such as Defendants GUEVARA and HALVORSEN, effectively condones, ratifies, and sanctions the kind of misconduct that the Police Officer Defendants committed against Plaintiff in this case. Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

184.    The City of Chicago and officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

185.    The policies and practices described in the foregoing paragraphs were consciously approved by the City of Chicago policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

186.    The actions of all of the individual Police Officer Defendants were done pursuant to policies and practices of the Chicago Police Department were done pursuant to one or more interrelated *de facto* policies, practices and/or customs of the Defendant City of Chicago which

were ratified by policymakers for the City of Chicago with final policymaking authority. These policies and practices included, among others:

    a.    conducting physically and psychologically or otherwise illegal or improperly coercive interrogations of witnesses in order to obtain false statements and wrongful convictions.

    b.    manufacturing and fabricating false witness statements, and manipulating and lying to witnesses to influence unreliable and inaccurate testimony.

    c.    filing false reports and giving false statements and testimony about interrogations and witness interviews or constructing parts or all of witness statements; suppressing evidence concerning interrogations and/or witness interviews; pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of fabricated witness statements, including those by "jailhouse snitches;" and otherwise covering up the true nature of those interviews and/or interrogations.

    d.    failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who are repeatedly accused of misconduct, on how to avoid false arrests, wrongful imprisonments, malicious prosecutions, and wrongful convictions, and on the proper manner in which to conduct interrogations of witnesses and arrestees. Among those the City failed to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control were the repeat offenders Defendants GUEVARA and HALVORSEN.

     e.     perpetuating, encouraging and condoning the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a-d above, whereby police officers refused to report or otherwise covered-up instances of police misconduct, and/or fabricated, suppressed and destroyed evidence of which they were aware, despite their obligation under the law and police regulations to report. This code of silence caused police officers either to remain silent or give false and misleading information during official investigations and Grand Jury proceedings in order to protect themselves or fellow officers from discipline, civil liability, or criminal charges. The code of silence also caused police officers to perjure themselves in criminal cases where they and their fellow officers have fabricated evidence or concealed exculpatory evidence.

187. The policies and practices described in this Count and in the factual allegations section of this Complaint were maintained and implemented by the City of Chicago with deliberate indifference to Plaintiff's constitutional rights.

188. As a direct and proximate result of the City's actions, Plaintiff suffered injuries, including, but not limited to, emotion distress, as if more fully alleged above.

189. The City of Chicago is therefore liable for the misconduct committed by the Police Officer Defendants.


**COUNT VII**
**State Law Claim – Malicious Prosecution**

190. Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

191. All of the individual Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued with malice and resulted in the injury to Plaintiff. All such proceedings were ultimately terminated in Plaintiff's favor and in a manner indicative of innocence.

192. The Defendants accused Plaintiff of murdering Merkes and Rodriguez, knowing that he was innocent of the crime. All of the individual defendants fabricated evidence, manipulated witness testimony, and withheld exculpatory evidence. The individual Defendant officers knowingly made false statements to prosecutors with the intent of exerting influence to institute and continue judicial proceedings against Plaintiff.

193. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

194. As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## COUNT VIII
## State Law Claim – Civil Conspiracy

195. Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

196. As described more fully in the preceding paragraphs, the individual Defendant officers acting in concert with one another and other co-conspirators, known and unknown, conspired to accomplish an unlawful purpose by unlawful means.

197. In furtherance of the conspiracy, the Defendants committed overt acts and were otherwise willing participants in joint activity.

198.    The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

199.    As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## COUNT IX
### State Law Claim – Intentional Infliction of Emotional Distress

200.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

201.    The acts and conduct of the individual Defendants as set forth above were extreme and outrageous. The Defendants intended to cause, or were in reckless disregard of the probability that their conduct would cause sever, emotional distress to Plaintiff.

202.    The individual Defendants' actions and conduct directly and proximately caused severe emotional distress to Plaintiff, and thereby constituted intentional infliction of emotional distress.

203.    The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

204.    As a direct and proximate result of Defendants' wrongful acts, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## COUNT X
### State Law Claim – Respondeat Superior

205.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

206.    When they committed the acts alleged in this Complaint, the individual Defendant officers were members and agents of the Chicago Police Department, an agency of the City of

Chicago, acting at all relevant times within the scope of their employment and under color of law.

207.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

## COUNT XI
## State Law Claim – Indemnification

208.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

209.    Illinois law provides that public entities must pay any tort judgment for compensatory damages for which its employees are liable based on upon the employees' misconduct committed within the scope of their employment activities.

210.    The individual Defendant officers are or were employees of the Chicago Police Department, an agency of the City of Chicago, who acted within the scope of their employment in committing the misconduct described herein.

**WHEREFORE**, Plaintiff Roberto Almodovar, Jr. prays this Court enter judgment in his favor and against Defendants Reynaldo GUEVARA, Ernest HALVORSEN, Mark OLSZESKI, and the City of Chicago, and Cook County awarding compensatory damages, costs and attorneys' fees against all Defendants, and punitive damages against each of the individual Defendants in their individual capacities; and for such further and additional relief as this Court may deem appropriate and just.

## JURY DEMAND

Plaintiff demands trial by jury.

Respectfully Submitted,

**ROBERTO ALMODOVAR, JR.**

By:  /S/ JENNIFER BONJEAN
   /S/ ASHLEY COHEN
   *Plaintiff's Attorneys*

   Jennifer Bonjean
   Ashley Cohen
   Bonjean Law Group, PLLC
   750 Lexington Avenue, 9th Floor
   New York, New York 10022
   718-875-1850